## CROOKER *versus* JEWELL *&* al.

In a real action the demandant introduced a series of deeds from the year 1786, under which the title was traced to himself. One of the deeds was made in 1807, the grantor being then disseized. The tenant made title in himself under a different source, as shown by a series of deeds from 1804, under which possession had been held from that to the present time. *Held,* the demandant was not entitled to recover.

The owner of land, though disseized in 1804, conveyed the same by deed in 1807 to the demandant, who entered into possession. *Held,* that the demandant's action is not maintainable, if the subsequent acts of ownership, exercised by the disseizor, were of as important a character, and of as long a continuance, as those of the demandant.

Lapse of time furnishes no presumption that a debt, secured by a mortgage of land, has been paid, if the possession of the land has been constantly in the mortgagee.

By the act of 1789, an administrator of a mortgagee had authority to assign the mortgage; and such an assignment could be effected by a quitclaim deed, if the intent thereby to convey the title be apparent.

WRIT OF ENTRY. The trial was before SHEPLEY, C. J.

The demanded premises were about one acre of land and flats.

Among the deeds relied on by the tenants, was a mortgage from one Coombs to Nathan Hunt, and a quitclaim from Mary Hunt, as administratrix of said Nathan, made in 1811.

The other evidence, both documentary and oral, so far as necessary to be presented, will be found in the opinion of the court.

The demandant contended that, even if the grantor in the deed of 1807, was disseized by the tenants when the deed was made, yet he would be entitled to be restored to the possession, unless the tenants exhibited a good title.

The ruling was, *that* if a person was in the exclusive possession of premises and was disseized by one having no title, he would be entitled to be restored to possession, although he had no other title than possession; *that* the rule, however, would not be applicable to the present case, if the tenants held under a title superior to that of the demandant; *that* the jury would consider whether those, from whom the tenants derive title, had entered under their respective conveyances, and claimed to hold under them; *that* the deed from the administratrix of Nathan Hunt operated to assign the mortgage, there being no evidence that there had been, before that time, a foreclosure; *that*, in such case, the demandant, though he were once seized, would not on this ground be entitled to recover.

The jury found a verdict for the tenants.

If these rulings or instructions were incorrect, the verdict is to be set aside and a new trial granted.

*Gilbert*, for the plaintiff.

*First.* — 1. The instruction to the jury, that they were to consider whether the tenant's predecessors had entered under their respective conveyances, and claimed to hold under them, without qualification, implies too much. *Small* v. *Proctor*, 15 Mass. 495—499.

2. The connection of this remark of the Judge, seems to give to subsequent possession, in reference to Mary Hunt's deed, the effect to pass the title under it; if this is correct, then the same ought to have been explicitly given in reference to Curtis's deed, to Lowell & Crooker's subsequent actual possession.

3. The jury should have been instructed to inquire who was in possession, when Mary Hunt made her deed.

4. Crooker was in possession, when the tenants took their deed. If their subsequent entry vested the grantor's title in them, then Crooker's subsequent possession, cured the previous defect in his title, if any.

*Second.* The jury were instructed that there was no evidence of foreclosure. We think the question of foreclosure

ought to have been submitted to the jury. ` *Boyd* v. *Shaw,* 14 Maine, 58 — 62 ; *Taylor* v. *Weld & al.* 5 Mass. 109 — 121.

*Third.* If there was no evidence of a foreclosure previous to Mary Hunt's deed, there is no more satisfactory evidence of a subsequent foreclosure, within twenty years from the time that payment became due ; and such being the case, the law presumes payment. *Joy* v. *Adams,* 26 Maine, 331 — 333.

And payment of the mortgage debt is a discharge of the mortgage. *Davis* v. *Maynard,* 9 Mass. 242 — 247 ; *Crosby* v. *Chase,* 17 Maine, 369 — 371 ; *Allard* v. *Lane,* 18 Maine, 9 — 11.

If the jury found no facts constituting a foreclosure, they should have been instructed that the mortgage debt was presumed to have been paid, in the absence of proof to the contrary.

*Fourth.* The instruction gave to Mary Hunt's deed the effect of an assignment of the mortgage.

But there is no evidence of an intention to assign. *Hunt* v. *Hunt,* 14 Pick. 374 ; *Cutter* v. *Danforth,* 1 Pick. 81 ; *Freeman* v. *McGaw,* 15 Pick. 82 ; *Hatch* v. *Kimball,* 22 Maine, 85 ; *Given* v. *Marr,* 27 Maine, 212 ; *Wingate* v. *Leeman,* 27 Maine, 174 — 178.

When an assignment of a mortgage is effected by a quit-claim deed, it operates as a bargain and sale. *Cases above cited.*  `

It is an alienation of the legal estate. *Gould* v. *Newman,* 6 Mass. 242.

Administratrix, as such, cannot make a deed of bargain and sale, or alienate the intestate's real estate.

*Tallman* and *Booker,* for the defendants.

Shepley, C. J. — The case is presented on a report of the testimony with the instructions to the jury, accompanied by a motion to have the verdict set aside as against evidence, and a motion for a new trial on account of evidence newly discovered.

The premises demanded comprehend about one acre, mostly composed of flats ground covered by the flood tides of the Kennebec river.

The demandant claims to have derived his title from the widow and administratrix of Doct. Samuel Duncan ; and the tenant from a son and heir of the same person.

It was admitted, that Hannah Duncan was after the death of her first husband married to Caleb Samson, and that Mary Hunt was the administratrix of Nathan Hunt.

A tract of land containing about fourteen acres, with the marsh and thatch beds thereto adjoining and including the premises, was conveyed by Jonathan Davis and Jonathan Davis, jr. to Hannah Duncan, by deed bearing date on July 3, 1786, and recorded on August 30, 1786.

Caleb Samson " and Hannah Samson, administratrix to the estate of Samuel Duncan, in consideration of three hundred pounds to us paid by James Curtis, as guardian to the children of the said Samuel," convey to him all right, title and interest to the tract of land before named, excepting two acres in the south-west corner sold to Nathan Morrison. The deed, bearing date on April 30, 1789, was recorded July 8, 1789.

James Curtis, by deed bearing date on Nov. 28, 1807, recorded on December 1, 1807, in consideration of one dollar paid by his son-in-law, John Lowell, and for divers other good and valuable considerations, conveys to him all the right, which he acquired by virtue of the deed of Caleb Samson and wife to him.

John Lowell, by deed bearing date on November 13, 1821, and recorded on January 2, 1822, in consideration of $150, conveys the premises demanded to the demandant.

The tenants claim to have derived title to the premises by a deed bearing date on May 5, 1804, and recorded on Dec. 21, 1804, from Samuel E. Duncan to Nathaniel Coombs, describing them. Nathaniel Coombs, by deed bearing date on December 20, 1804, and recorded on December 21, 1804, conveyed the same in mortgage to Nathan Hunt.

Mary Hunt, as administratrix of Nathan Hunt, by quitclaim

deed, bearing date on September 10, 1811, and recorded on September 26, 1811, conveyed the same to John Green and William Richardson, who conveyed the same to the tenants on October 18, 1836.

The lot containing about fourteen acres, and called by a witness the old Doct. Duncan estate, appears to have been occupied in part at least, by Samuel E. Duncan, who built a house upon it. Coombs entered upon the part conveyed to him, and built a shed upon it, and occupied it for several years as a spar-maker. One witness states, for five, six or seven years. His mortgagee, Hunt, appears to have worked with him upon the premises, or to have occupied with him for a short time. After the conveyance to the Richardsons there is testimony tending to prove, that one of them occupied the premises till two or three years after the peace made in the year 1815, by keeping his rafts upon them as he had occasion to use them. The premises were taxed to the Richardsons from 1813 to the time when they were conveyed to the tenants, who, it is admitted, have occupied them since that time.

The testimony does not present any proof, that James Curtis or John Lowell ever took possession of the premises, or ever exercised any act of ownership over them. A witness for the demandant testifies, that in June, 1807, there was a piece of an old wharf and of an old mast-shed then standing on the premises; and that no one was in possession of them.

It is apparent, that the jury, upon the testimony, would be fully authorized, if not required, to find, that James Curtis was disseized at the time, when he made the conveyance to John Lowell.

The demandant's counsel, perceiving that he might thus fail to acquire any legal title, contended that he would be entitled to recover, because he had entered into possession under his deed from Lowell, and would be entitled to have that possession restored to him.

There was testimony to prove, that he had, after that conveyance, exercised acts of ownership over the premises, and

that he might be entitled to recover, if the tenants were found to be in possession without a better title. But if they could be regarded as holding under a title derived from Samuel E. Duncan, in the year 1804, accompanied by an actual entry and by acts of ownership by the several grantees, of as important a character and of as long continuance as those exercised by the demandant, it would become quite clear, that the demandant could not be entitled to recover.

It would become material in this aspect of the case, that the jury should be instructed, whether those conveyances were operative to convey the title, and that they should, as they were instructed to do, " consider whether those, from whom tenants derive their title, had entered under their respective conveyances and claimed to hold under them." The testimony would fully authorize the jury to find, that they did so enter and claim the premises.

" The plaintiff contends that this instruction is too strong." A reason assigned is, that " the testimony of Bennett is explicit, that the premises were abandoned at that date." He, however, only states, that no one was in possession in June, 1807. Or, in other words, that no one appeared to be in the visible occupation. Such testimony might well be regarded by the jury as failing to prove, that one, who had purchased for a valuable consideration, and who had entered under a recorded title and made improvements upon the estate, had abandoned it, because he had ceased for a time to be a visible occupant of a piece of flats ground, on which his improvements continued to remain. That clause of the instructions did not state any rule of law or attempt to control the judgments of the jurors. It simply and correctly directed them to the performance of an appropriate duty. The conclusion of the instructions, which states, that the demandant, if he were once seized, would not on this ground be entitled to recover, if the jury should so find, is not the subject of complaint. There can be no doubt, that it was correct.

The motion to have the verdict set aside, as being found against the evidence, cannot prevail.

The testimony newly discovered, is contained in the depositions of Benjamin McGill and of his wife.

The substance, so far as material, in that of the husband is, that he came to Bath in May, 1807. That in the fall of that year he worked with Coombs on the shore, a quarter or a third of a mile from the premises. That there was an old "rack of a shed, in which he told me, he used to work," standing on a cobb-work on the premises. That he often passed there during the summer of the year 1807, and did not know of Coombs working there then or afterward. That he worked with him in other places in the fall of 1808.

The substance of that of his wife is, that Coombs had a spar-yard on Donnell's creek, that he occupied it some time before and after his marriage, which took place in the year 1805, that she brought chips from there in the year 1808 which were not very bright. In answer to a question, where Coombs worked from 1804 to 1808, she says, " of course he worked in the shed, for he had no other spar-yard, that I know of."

This testimony could only be useful to prove, that Curtis was not disseized at the time of his conveyance made in the month of November, 1807. The remarks already made upon that part of the case may in many respects be applicable to it. Taken in connection with that of Bennett it would only prove, that Coombs was not then in the visible occupation of the premises. It would not, when taken in connection with the other testimony in the case, be satisfactory proof, that he had abandoned them, much less would it prove, that his mortgagee, Hunt, had. This testimony is also cumulative. The motion founded upon this testimony cannot prevail.

The first cause of complaint of the instructions has been considered.

The second, in substance is, that the jury were instructed, that there was no evidence of a foreclosure of the mortgage, before the conveyance was made to the Richardsons.

If the case presents any testimony, from which a foreclosure could have been properly found by the jury, the complaint

would be just. But the argument fails to satisfy the mind, that there was any.

The third is, that if there was no foreclosure, the instructions would be erroneous, because the presumption of law, arising from lapse of time, would then be, that the mortgage had been paid, and then the tenants would have no title.

Such a presumption does not arise in a case like the present, when the mortgagee or those claiming under him, and not the mortgager, have been in possession. *Howland* v. *Shurt-leff*, 2 Metc. 26.

The fourth error alleged is, that the jury were informed, that they might consider the deed from the administratrix of Nathan Hunt as operating to assign the mortgage, made by Coombs to Hunt, to the Richardsons.

Two questions are presented by that clause of the instructions, whether the administratrix could lawfully assign the mortgage ; and whether a quitclaim deed, purporting to convey the premises, would operate as an assignment of the mortgage.

The Act of the Commonwealth of Massachusetts, of February 11, 1789, then in force here, provided, that debts due on mortgages and the lands mortgaged " shall be assets in the hands of executors or administrators, as personal estate ; and the executors or administrators shall have the same control and power of disposal of all the estate, which the deceased had in the lands, tenements and hereditaments mortgaged, as if they had been a pledge of personal estate." There being no doubt that an administrator could legally dispose of a mortgage, or pledge of personal estate, the authority to dispose of a mortgage of real estate is expressly given ; and that would necessarily include the power to assign it.

A quitclaim deed purporting to convey lands may operate as an assignment of a mortgage of them. *Carl* v. *Butman*, 7 Greenl. 102 ; *Hunt* v. *Hunt*, 14 Pick. 374. Such a deed having been made in this case, not to the mortgager, or to any person holding the equity of redemption, could not operate to discharge the mortgage, or in any other manner, than as an

assignment of the mortgage. It is manifest, that the parties intended, that it should operate to convey the title held by the intestate, and the law will give it effect, that it may operate to convey the title in the only mode, in which it could be conveyed.

*Motions overruled, and judgment on·the verdict.*